UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FRANCIS LARA,

          Petitioner,

    v.

JULIO HERNANDEZ; BRUCE SCOTT; MARKWAYNE MULLIN; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and TODD BLANCHE,

          Respondents.

C26-0747 TSZ

ORDER

THIS MATTER comes before the Court on an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, docket no. 17.[1]  Having reviewed all papers filed in support of, and in opposition to, the original and amended habeas petitions, including the response and materials filed by the United States Department of Homeland Security ("DHS"), Acting U.S. Attorney General Todd Blanche, DHS Secretary Markwayne Mullin, and Acting Director for the Seattle Field Office of U.S. Immigration and Customs Enforcement ("ICE") Julio Hernandez (collectively, "federal respondents"),

---

[1] Acting pro se, petitioner filed a habeas petition in March 2026.  Because petitioner is a member of the class certified in _Franco-Gonzales v. Napolitano_, No. CV 10-2211, 2011 WL 11705815 (C.D. Cal. Nov. 21, 2011), the Court requested that the Northwest Immigrant Rights Project ("NWIRP"), which was among the counsel of record for the _Franco-Gonzales_ class, consult with petitioner and advise whether it would seek appointment to represent petitioner in this case.  Order (docket no. 11).  Having responded in the affirmative, NWIRP was appointed in late April 2026, _see_ Order (docket no. 12), and NWIRP attorneys filed an amended habeas petition in mid-May 2026, _see_ Am. Pet. (docket no. 17).

ORDER - 1

*see* Return (docket no. 25); Andrade Decl. (docket no. 26), as well as NWIRP's reply thereto, *see* Traverse (docket no. 27), the Court enters the following Order.

**Background**

Petitioner Francis Lara, also known as Francis Lambert, *see* Ex. A to Am. Pet. (docket no. 17-1 at 4), is a citizen of the Republic of Honduras who entered the United States in 1989; she has been in DHS and/or ICE custody since August 24, 2024. *See id.* (docket no. 17-1 at 6–7); *see also* Sica Decl. at ¶ 3 (docket no. 9); *id.* at ¶ 13 (incorrectly stating that petitioner was taken into custody in October 2024). At the time petitioner was detained, she was lawfully in the United States, having been granted asylum by the Board of Immigration Appeals ("BIA") in June 2003. *See* Ex. B to Am. Pet. (docket no. 17-2 at 5–10). Without prior notice or an opportunity to be heard, and in the absence of any warrant,[2] petitioner was arrested by ICE Enforcement and Removal Operations personnel in Alaska, while driving away from her apartment. *See* Ex. A to Am. Pet. (docket no. 17-1 at 6–7). The alleged basis for taking petitioner into custody was a 2017 conviction, by way of a guilty plea, for a federal offense (distribution of a mixture

---

[2] Petitioner was arrested on August 24, 2024, but an arrest warrant was not approved by a designated official until August 27, 2024. Ex. A to Am. Pet. (docket no. 17-1 at 6). The Immigration and Nationality Act ("INA") authorizes the Attorney General to issue a warrant, arrest an alien, and detain such alien "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). An individual may be arrested and taken into custody under the authority of Form I-200 (Warrant for Arrest) **only** "[a]t the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed." 8 C.F.R. § 236.1(b)(1); *see Prieto-Romero v. Clark*, 534 F.3d 1053, 1058 (9th Cir. 2008) ("The Attorney General may issue a warrant of arrest *concurrently* with the notice to appear." (emphasis added)); *see also Alberto C.M. v. Noem*, 817 F. Supp. 3d 735, 739 (D. Minn. 2026) ("a warrant is a necessary condition to justify discretionary detention" under § 1226(a)). Importantly, no notice to appear was issued to petitioner prior to (or even contemporaneously with) her arrest.

ORDER - 2

containing a detectable amount of cocaine base), as to which petitioner was sentenced in 2019 to time served.[3]  _See_ Ex. B to Am. Pet. (docket no. 17-2 at 48–61 & 63–70).

On June 13, 2025, the BIA granted DHS's motion to reopen petitioner's removal proceedings for purposes of establishing that her now over-eight-year-old conviction constitutes a basis for terminating her asylum status.  Ex. H to Am. Pet. (docket no. 17-8). On September 8, 2025, after reviewing certain medical records that DHS had filed,[4] an immigration judge found petitioner competent to continue with immigration proceedings on a pro se basis.  _See_ Sica Decl. at ¶ 19 (docket no. 9).  Neither a transcript of the September 8, 2025, hearing nor a copy of any written findings regarding petitioner's competency has been provided to the Court.

On October 29, 2025, an immigration judge completed a check-box form of order to remove petitioner to Honduras.  Ex. I to Am. Pet. (docket no. 17-9).  On November 5, 2025, DHS notified the Immigration Court in Tacoma, Washington that petitioner is a

---

[3] NWIRP has not argued, on petitioner's behalf, that she was detained in violation of her due process rights.  The Court notes, however, that at the time of her arrest, petitioner was **lawfully** in the United States; DHS had not yet asserted, let alone established, that the conviction for which she was sentenced in 2019 was a basis for revoking her asylee status.  Petitioner's arrest was not based on any probable cause to believe she had committed or was committing a criminal offense, and her detention was not effectuated pursuant to a valid warrant.  ICE agents took petitioner into custody near her home, indicating that her whereabouts were then known, and federal respondents have made no showing that, prior to August 24, 2024, petitioner had been recalcitrant, that petitioner could not have simply been served with a notice to appear for immigration proceedings in an out-of-custody manner, or that ICE's detention authority was properly exercised under INA § 236 (8 U.S.C. § 1226).

[4] Exactly what medical records DHS submitted has not been specified, but they were presumably limited to the medical records generated while petitioner had been in custody and pre-dated the September 2025 hearing.

ORDER - 3

member of the *Franco-Gonzalez* class.[5]  *See* Ex. G to Steveson Decl. (docket no. 10-7). On DHS's motion, petitioner's removal proceedings were reopened, *see* Sica Decl. at ¶ 24 (docket no. 9), and on December 2, 2025, an immigration judge conducted a bond hearing, at which petitioner appeared pro se and was denied release on the grounds that she posed a danger to the community and a flight risk, *see id.* at ¶ 25; Ex. N to Am. Pet. (docket no. 17-14).[6]

According to federal respondents, the immigration judge found petitioner competent before forcing her to proceed in the bond hearing without the assistance of counsel.  *See* Return at 4 (docket no. 25).  The transcript of the December 2025 bond hearing does not, however, support this assertion.  *See* Ex. A to Andrade Decl. (docket no. 26-1).  Rather, when addressing petitioner's competency, the immigration judge merely referenced "a previous hearing," apparently alluding to the hearing that occurred on September 8, 2025, before DHS provided notice of petitioner's membership in the *Franco-Gonzalez* class.  *See id.* (docket no. 26-1 at 3).  During the bond hearing, the

[5] Under *Franco-Gonzalez*, class members "who have a serious mental disorder or defect that renders them incompetent to represent themselves" are entitled to a "Qualified Representative" in immigration proceedings, and class members "who have been detained for more than six months" are entitled to a bond hearing within 180 days after being identified.  *See* Order at 2 (docket no. 11) (quoting *Franco-Gonzalez*, 2011 WL 11705815, at *16, and *Franco-Gonzalez v. Holder*, No. CV 10-2211, 2013 WL 8115423, at *1–2 (C.D. Cal. Apr. 23, 2013)).

[6] In response to the original habeas petition, the ICE Field Office Director asserted that petitioner was mandatorily detained under INA § 236(c) (8 U.S.C. § 1226(c)) because of her federal drug-related conviction.  *See* Return at 5 (docket no. 8).  This argument is inconsistent with the provision of a bond hearing, and the immigration judge did not rely on INA § 236(c) as a basis for keeping petitioner in custody.  *See* Ex. N to Am. Pet. (docket no. 17-14).  Moreover, in their answer to the amended petition, federal respondents appear to concede that, notwithstanding INA § 236(c), members of the *Franco-Gonzalez* class who are detained for more than 180 days are entitled to a bond hearing.  *See* Return at 2 (docket no. 25).  The Court therefore concludes that petitioner is not subject to mandatory detention.

ORDER - 4

immigration judge did not mention the additional medical records attached to DHS's *Franco-Gonzalez* notice, which included medical staff notes prepared after September 8, 2025, documenting petitioner's reports of auditory hallucinations, flashbacks and nightmares of past trauma, depression (including wishing she were dead or did not wake up from sleeping), severe anxiety, and an inability to concentrate. *See* Ex. L to Am. Pet. (docket no. 17-12 at 6–59). Moreover, the immigration judge did not conduct a sufficient colloquy for assessing petitioner's competence. *See* Ex. A to Andrade Decl. (docket no. 26-1 at 4–7). The minimal information elicited by the immigration judge suggested that petitioner was much less equipped than most individuals in her situation to represent herself. *See id.* (docket no. 26-1 at 4, 7, & 9) (indicating that, through an interpreter, petitioner stated, "I do not know how to represent myself," that, when asked about her four children, petitioner indicated she did not recall their ages and did not know whether they are adults, and that petitioner told the immigration judge she was "turning even more crazy being locked up," was "seeing things," and "having hallucinations").

Notably, eight days **after** denying release on bond, the immigration judge requested a forensic competency evaluation ("FCE") of petitioner, *see* Sica Decl. at ¶ 26 (docket no. 9), which reflects an awareness by the immigration judge that the earlier finding of competence was without evidentiary support. At a hearing on January 22, 2026, no transcript or recording of which has been provided, the immigration judge, relying on the FCE results, which are also not part of the record before this Court, again found petitioner competent to represent herself. *See id.* at ¶ 28; *see also* Am. Pet. at ¶ 44 (docket no. 17) (indicating that the FCE concluded petitioner suffered from "significant

ORDER - 5

depression" and would likely benefit from appointment of a representative, but would likely be able to represent herself).  To be clear, the issue of whether petitioner is in fact competent and able to represent herself is not before the Court, and the Court makes no ruling on the subject.  The Court has, however, considered the immigration judge's decision to require petitioner to proceed pro se at the bond hearing, without having engaged in an adequate analysis concerning petitioner's competence, as displaying a disregard for petitioner's *Franco-Gonzalez* and due process rights.

**Discussion**

On her behalf, NWIRP seeks petitioner's immediate release from the Northwest ICE Processing Center ("NWIPC") as a remedy for violation of the permanent injunction issued in *Franco-Gonzalez* and/or for violation of petitioner's due process rights under the Fifth Amendment.  *See* Am. Pet. at ¶¶ 67–77 (docket no. 17).  Federal respondents do not challenge the Court's jurisdiction, *see* Return at 4 (docket no. 8), and the Court has authority to grant a writ of habeas corpus to an individual who is in custody "in violation of the Constitution or law or treaties of the United States," *see* 28 U.S.C. § 2241(c)(3).

**A.      Exhaustion**

In response to the original (pro se) petition, the ICE Field Office Director argued that petitioner was required to exhaust her administrative remedies before challenging the immigration judge's denial of release on bond.  *See* Return at 8–10 (docket no. 8).  In answering the amended petition, federal respondents have not repeated this contention, *see* Return (docket no. 25), but the Court nevertheless addresses it.  In the immigration habeas context, administrative exhaustion is prudential, not jurisdictional.  *See W.T.M. v.*

ORDER - 6

*Bondi*, No. 25-cv-2428, 2026 WL 262583, at *2 (W.D. Wash. Jan. 30, 2026).  The Court may waive prudential exhaustion if (i) the administrative remedies are "inadequate or not efficacious," (ii) "pursuit of administrative remedies would be a futile gesture," (iii) "irreparable injury" might result, or (iv) "the administrative proceedings would be void."  *See Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) (quoting *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004)).  Given federal respondents' apparent retreat from the earlier position on the subject of exhaustion, as well as the immigration judge's failure, after being notified of petitioner's membership in the *Franco-Gonzalez* class, to consider anew and in a thorough way the question of whether petitioner was competent to proceed in the bond hearing without a "Qualified Representative," the Court concludes that exhaustion poses no barrier to its review of the immigration judge's decision refusing to adjust petitioner's custody status.

**B.      Abuse of Discretion**

The determination of whether a noncitizen is "dangerous" or a "flight risk" for immigration-detention purposes involves a mixed question of law and fact that is reviewable in habeas proceedings for an abuse of discretion.  *See Martinez v. Clark*, 124 F.4th 775, 779–80 (9th Cir. 2024) (citing *Wilkinson v. Garland*, 601 U.S. 209 (2024)).  In their response to the amended habeas petition, federal respondents do not even attempt to support the immigration judge's substantive ruling.  *See* Return (docket no. 25).  During the course of the bond hearing, the immigration judge offered no explanation for her findings of dangerousness and flight risk, and the record contains no written decision on the subject.  Thus, the Court bases its decision on the facts that were available to the

ORDER - 7

immigration judge at the time she forced petitioner to proceed without the benefit of counsel and denied petitioner's release on bond.  Having consider such information, the Court concludes that the immigration judge abused her discretion.

### 1.    Flight Risk

DHS neither argued for a finding nor offered evidence of "flight risk."  *See* Ex. A to Andrade Decl. (docket no. 26-1 at 5–6).  Petitioner has four children who are citizens of, and therefore rooted in, the United States.  *See* Ex. A to Andrade Decl. (docket no. 26-1 at 6); Am. Pet. at ¶ 25 (docket no. 17); *see also* Ex. L to Am. Pet. (docket no. 17-12 at 41) (according to DHS's medical records, petitioner has four children, the first of whom was born in 1993).  Until her arrest in August 2024, petitioner had steady employment, and she has community connections developed over the period from 1989, when she first entered the country, to the present.  *See* Am. Pet. at ¶¶ 22 & 65–66 (docket no. 17); *see also* Ex. B to Am. Pet (docket no. 17-2 at 36) (stating that petitioner "had been gainfully employed for the past two decades," most recently as a "patient care assistant" for "Consumer Care Network").  Petitioner's son resides in Tacoma, and petitioner told the immigration judge that she could reside with him if released.  Ex. A to Andrade Decl. (docket no. 26-1 at 7).  The immigration judge did not hold DHS to the burden that federal respondents concede was applicable under *Franco-Gonzalez*, namely of demonstrating "flight risk" by "clear and convincing evidence," *see* Return at 2 (docket no. 25) (citing *Franco-Gonzalez v. Holder*, No. CV 10-2211, 2013 WL 3674492, at *13 (C.D. Cal. Apr. 23, 2013)), and her finding of "flight risk" was unsupported by the record.

ORDER - 8

## 2.    **Dangerousness**

In concluding that petitioner poses a danger to the community, the immigration judge ignored the materials before her.  In the mid-1990s, petitioner was arrested multiple times in California.  *See* Ex. A to Am. Pet. (docket no. 17-1 at 19).  One of these arrests ripened into a conviction, by way of guilty plea, for a state drug offense.  *See* Ex. B to Am. Pet. (docket no. 17-2 at 12, 15–16, & 17–26).  At the bond hearing, DHS asserted that petitioner had three convictions in 1994, two for "dangerous drugs" and one for burglary, but the documents submitted by DHS substantially contradicted this representation.  *See* DHS Notice of Evidence, Ex. A to Am. Pet. (docket no. 17-1 at 19–20 & 22–23) (indicating that the burglary charge was dismissed and providing proof of only one drug-related conviction).  Moreover, notwithstanding this criminal history, petitioner was granted asylum in 2003, approximately nine years after the one state law offense proven by DHS.  *See* Ex. B to Am. Pet. (docket no. 17-2 at 5–10).  Given the BIA's intervening decision to confer asylee status and the staleness of petitioner's 1994 conviction, which pre-dated the bond hearing by roughly 31 years, this criminal history cannot reasonably be considered support for a finding of dangerousness.  *See Padilla Paz v. Hernandez*, --- F. Supp. 3d ---, 2026 WL 1413096, at *6–7 (W.D. Wash. May 15, 2026) (observing that the immigration judge failed to consider "the 'recency' (or more aptly, remoteness) of [the petitioner's] offenses as he was required to do").

With respect to petitioner's federal conviction, which was based on a guilty plea entered in November 2017, more than eight years before the bond hearing, the immigration judge had received, prior to the bond hearing, mitigating information in the

ORDER - 9

form of the sentencing memorandum that an assistant federal defender provided to the U.S. district judge in Alaska.  *See* Am. Pet. at ¶ 41 (docket no. 17); *see also* Ex. B to Am. Pet. (docket no. 17-2 at 33–39).  In the sentencing memorandum, defense counsel indicated that petitioner's conduct had been "driven by aggressive encouragement of the undercover agent who negotiated the transactions" at issue.  Ex. B to Am. Pet. (docket no. 17-2 at 34–35).  According to defense counsel, petitioner never initiated the drug deals, and she "expressed reluctance to take part" in the transactions.[7]  *Id.* (docket no. 17-2 at 35).  Petitioner has been subjected to extreme trauma and abuse, having been kidnapped and forced to work as a prostitute in Honduras, *see id.* (docket no. 17-2 at 5–6), and having survived being beaten by a former boyfriend and hit with a truck by her ex-husband, *see id.* (docket no. 17-2 at 36), and the record suggests that, rather than being predisposed to criminal activity, petitioner has been in situations in which she felt pressured or coerced to participate.  Petitioner's victimization in Honduras was the reason she was granted asylum, *see* Ex. B to Am. Pet. (docket no. 17-2 at 5–10), and the immigration judge's apparent failure to consider the foregoing information, as evidenced

---

[7] According to the sentencing memorandum submitted by the U.S. Attorney for the District of Alaska, which petitioner had also provided to the immigration judge, in late June 2015, petitioner was contacted by an undercover officer through a confidential informant.  *See* Ex. B to Am. Pet. (docket no. 17-2 at 42).  On three separate occasions between June 26 and October 7, 2015, petitioner sold a substance containing cocaine base to the undercover officer; the transactions involved a total of three ounces for which petitioner received $5,700.  *Id.*  On October 21, 2025, petitioner was arrested before a proposed deal was consummated, and approximately four ounces of a substance containing cocaine base was found in her vehicle, along with her then-teenage daughter.  *Id.*  The United States requested a sentence of 37 months, which was the bottom of the advisory guideline range.  *Id.* (docket no. 17-2 at 44).  The district judge imposed only time served, *id.* (docket no. 17-2 at 64), approximately 29 months, which was consistent with the recommendation of defense counsel, *see id.* (docket no. 17-2 at 33).

ORDER - 10

by the immigration judge's failure to mention the documents provided by petitioner and the absence of any inquiry about the circumstances of the federal offense, _see_ Ex. A to Andrade Decl. (docket no. 26-1), reflects a disregard of the applicable nine-factor standard,[8] the duty to review all the evidence, and the "clear and convincing evidence" burden imposed on DHS.  _See Tavurov v. Noem_, No. 26-cv-668, 2026 WL 1283513, at *5 (W.D. Wash. May 11, 2026) ("'The 'clear and convincing' standard requires the Government to present evidence to establish 'an abiding conviction that the truth of [the] factual contentions at issue is highly probable.'' [It] is 'a high burden and must be demonstrated in fact, not 'in theory.''" (alterations in original, citations omitted)); _see also Padilla Paz_, 2026 WL 1413096, at *5–6 (ruling that the immigration judge abused his discretion by failing to "correctly appl[y] the statutory standard to a given set of facts" (alteration in original, quoting _Martinez_, 124 F.4th at 783)).  Because the record contains neither any analysis or reasoning by immigration judge nor the requisite "clear and convincing" evidence of petitioner's dangerousness, the Court concludes that the immigration judge abused her discretion in finding petitioner a danger to the community.

---

[8] Under BIA precedent, in determining whether a noncitizen is a danger to the community and/or a flight risk, an immigration judge weighs the following nine factors:  (1) the existence of a fixed address in the United States; (2) the length of residence in the United States; (3) family ties and whether they might entitle the noncitizen to reside permanently in the United States in the future; (4) employment history; (5) the record of court appearances; (6) the criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the history of immigration violations; (8) any attempts to flee prosecution or escape from authorities; and (9) the manner of entry to the United States.  _Martinez_, 124 F.4th at 783 (quoting _In re Guerra_, 24 I. & N. Dec. 37, 40 (BIA 2006)).

ORDER - 11

**C.    Remedy**

Having concluded that the immigration judge abused her discretion in denying a change in custody status, the question remains whether the proper remedy is requiring petitioner's release or another bond hearing.  The Court is persuaded that the appropriate habeas relief is release from custody.  The only basis on which DHS proposes to keep petitioner detained is her 2017 conviction, but evidence that was provided in support of the amended habeas petition, and that would presumably be presented in any second bond hearing, shows DHS cannot establish by "clear and convincing evidence" that petitioner, a woman who is now near 57 years of age, is a danger to the community.  While on supervised release for her federal conviction, petitioner graduated from a substance abuse treatment program and maintained her sobriety.  _See_ Ex. E to Am. Pet. (docket no. 17-5).  According to U.S. Probation personnel, during the period of supervised release, petitioner had a stable residence and employment, as well as supportive social networks, and, amidst the COVID-19 pandemic, she managed to complete 73 of 150 hours of required community service.  _Id._  In early February 2022, petitioner was discharged after three successful years on supervised release.  _Id._  No suggestion has been made and federal respondents have offered no evidence that, during the period from February 2022 to August 2024, when petitioner was detained, she was anything other than a model of good behavior.  No purpose would be served by requiring petitioner to endure another bond hearing and additional time in custody.

/ / /

/ / /

ORDER - 12

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) The amended petition for a writ of habeas corpus, docket no. 17, is GRANTED, and within twenty-four (24) hours of the entry of this Order, respondents shall RELEASE petitioner Francis Lara, also known as Francis Lambert, from custody at the NWIPC;

(2) Respondents shall return to petitioner or her counsel any seized personal property, including personal identification and employment authorization documents;

(3) Within forty-eight (48) hours of the entry of this Order, respondents shall file a declaration confirming that petitioner has been released from custody and that any seized personal property has been returned to petitioner or her counsel;

(4) Respondents shall not re-detain petitioner, or subject petitioner to electronic monitoring, without at least seven (7) days' advance written notice and a pre-deprivation hearing before a neutral decisionmaker unless probable cause exists for believing petitioner has committed or is attempting to commit a criminal offense;

(5) The Clerk is directed to enter judgment consistent herewith after the declaration required by Paragraph 3, above, has been filed and to send a copy of this Order and the Judgment to all counsel of record.

IT IS SO ORDERED.

Dated this 18th day of June, 2026.

Thomas S. Zilly
United States District Judge

ORDER - 13